We'll hear argument first this morning in Case 18-587, the Department of Homeland Security v. Regents of the Univ. of California and their related cases. General Francisco? Mr. Chief Justice, and may it please the Court, in 2017, the Fifth Circuit held that DAPA and the expansion of DACA were likely unlawful, a judgment this Court affirmed by an equally divided Court. In the face of those decisions, the Department of Homeland Security reasonably determined that it no longer wished to retain the DACA policy, based on its belief that the policy was illegal, its serious doubts about its illegality, and its general opposition to broad non-enforcement policies. That decision did not violate the APA for two reasons. First, it's not subject to judicial review. The rescission simply ended a previous non-enforcement policy whereby the Department agreed to not enforce the INA against hundreds of thousands of illegal aliens. But the decision whether or not to enforce the law is committed to the agency's unreviewable discretion unless a statute restricts it. And nothing in the INA requires the Department, a law enforcement agency, to not enforce the law. Second, the decision to end this non-enforcement policy was eminently reasonable. DACA was a temporary stopgap measure that on its face could be rescinded at any time, and the Department's reasonable concerns about its legality and its general opposition to broad non-enforcement policies provided more than a reasonable basis for ending it. After all, an agency isn't required to push its legally dubious power to not enforce the law to its logical extreme, since it undermines confidence in the rule of law itself and it conflicts with the agency's law enforcement mission. I'd like to begin with the reviewability question. If the Attorney General were to say that he wasn't going to seek death penalty prosecutions because he thought the death penalty was unconstitutional, that would be immune from judicial review. And if a new Attorney General came in and reversed that policy because he believed that the death penalty was constitutional, that would likewise be immune from judicial review. General Francisco, there's a strange element to your argument, because you're arguing this is a discretionary matter, it's not reviewable because it's committed to agency discretion. But on the other hand, you say the agency had no discretion because this program was illegal. In other words, the law requires you to drop DACA. So how can it be committed to your discretion when you're saying we have no discretion, this is an illegal program? For two reasons, Your Honor. First, we put forward both legal and policy reasons for the rescission. So this case is on all fours with Cheney, where the FDA likewise put forth legal and policy reasons. Its principal argument was that it lacked jurisdiction to regulate state use of drugs in carrying out the death penalty. Its alternative argument was that even if it had the legal authority to do so, it wouldn't have exercised it. And this court found that that decision was committed to the agency's unreviewable discretion. Here we are likewise making alternative legal and policy arguments. But secondly, even if we were making purely a legal argument, and we're not, but even if we were, review would be foreclosed by this court's decision in BLE. What the BLE case held was that if an action is committed to an agency's unreviewable discretion, then it doesn't matter what reason it gives for taking that action, it's still unreviewable. In the specific example, this court provided in BLE was a prosecutor who decided not to indict for a purely legal reason. And the court indicated that that was still unreviewable because the underlying action, the enforcement discretion, was committed to the agency's unreviewable discretion. So here we think we win under Cheney, and we also think we win under BLE. What if the Attorney General said he, in his exercise of prosecutorial discretion, was not going to enforce any of the immigration laws? Would that still be nonreviewable? Your Honor, then I think that you might run into Cheney's exception for a complete abdication of authority. But there's a critical difference between that and this. Here we are enforcing the law. You can understand why Congress or the courts might say that you can review a decision not to enforce the law. Congress, in fact, passes laws so they'll be enforced, and you can understand why it might restrict the government's ability to not enforce the law. Here we are enforcing the law, and it's very difficult to see why the Congress would ever pass the law, say that something is illegal, and then try to hamstring the government's ability to enforce it. That's why we think we clearly fall within the Cheney presumption that it's an exercise of enforcement discretion, and we don't fall within the Cheney exception, which would apply where Congress itself restricts the discretion or where there is a potential complete abdication of enforcement authority. As Cheney made clear, it might also be an exercise of enforcement discretion that are presumptively unreviewable, and that's what  I'm not saying that the original DACA is reviewable, but the rescission of DACA is not. In other words, are you suggesting that there's an asymmetry in what's reviewable, that they don't stand and fall together? There is, because there's a difference in the two policies. Both of them, to be clear, both of them fall within Cheney's presumption. Both of them reflect an exercise of enforcement discretion that are presumptively unreviewable. The question, then, is whether Congress has done anything to restrict that discretion. With respect to DAPA, the case that this Court had before it a couple of years ago, Texas argued that the INA actually restricted the agency's ability not to enforce the law. And you can certainly understand why Congress might try to hamstring the government's ability not to enforce the laws that it passes, and the Fifth Circuit agrees. So that fell within the Cheney exception to the presumption. Here, though, nobody is arguing, nobody on either side is arguing that the INA somehow restricts our ability to enforce the law. And it would be quite surprising if Congress were to pass a law that says something is illegal and then tries to somehow restrict the government's ability from enforcing the laws that it passes. So, again, I think we fall foursquare within the Cheney presumption, and the Cheney exception doesn't apply. And that exception applies, that exception covers both where the statute itself restricts the discretion, and, Chief Justice, to your question, it could also apply where there was a complete abdication of law enforcement responsibilities. That was one of the areas that Cheney reserved in that critical footnote four. But here, we're not not enforcing the law. We're enforcing the law, and there is simply nothing in the INA that somehow says to the Department of Homeland Security, you are restricted in any way or shape or form from enforcing the laws we pass. The response that you, that you gave to me, I didn't see, I thought that that was what you called the Duke Memorandum. Duke Memorandum said DACA is illegal. I didn't see where it said whether it's illegal or not as a matter of administration policy. We are withdrawing. I didn't see that. You said there were alternate arguments. I saw only the first. We can't enforce DACA. We can't adhere to DACA because it's illegal. So two responses, Your Honor. First of all, Secretary Nielsen's memorandum clearly encompasses all of the different arguments. It sets them forth in great detail, and we think that the Nielsen Memorandum is clearly properly before the court. The district court in Washington, D.C. specifically asked for it. We specifically provided it. The district court reviewed it. So the only question really is, what does it mean? And Secretary Nielsen in her memorandum effectively ratified Secretary Duke's decision for the reasons given using precisely the same mechanism that Secretary Duke used herself to issue the memo in the first place, the same mechanism that was used to issue the DACA memo, and the same mechanism used to issue the DAPA memo. So this isn't a post hoc rationalization of agency action. It is agency action. The whole point of the post hoc rationalization rule is to prevent courts from invading into executive branch decision-making. I thought the point, and this is an old argument, and there have been two bases. The first base is a big argument between Ken Davis and Berger. Is it that you can't review an agency? Does that little thing about you cannot, committed to agency discretion by law, does it mean that there are certain, just mean, that there are certain things an agency might do? Don't review them even if they're totally wrong, like Panama Canal totes. Right, okay. That reason this is unreviewable is because there's a long history and tradition of a prosecutor saying, I know that guy over there, or that woman here, and they may be guilty, but in my discretion, no, I don't want to prosecute them. There's a long history of that. And if that history and understandable power to give to a prosecutor is to be valid, courts stay out of it. Now that does not apply where what's at issue is not a prosecutor making an individualized decision, but rather an agency's policies, generalized, written down, and I can't think of a reason why in such a case you wouldn't review it in a court. So respectfully, Honor, I strongly disagree because Cheney himself involved not a prosecutor, but an agency, and not a single-shot enforcement action, but a general policy. Here's what the FDA said in the letter denying the petition brought by the inmates to have it regulate the state exercise of the death penalty. This is their principal conclusion. For the reasons given below, we conclude that the use of lethal injection by state penal systems is a practice over which FDA has no jurisdiction, and therefore that FDA has no authority to take the actions your petition requests. Accordingly, your petition is denied. Later it provided as the alternative rationale a policy rationale, and it says later, thus, as a secondary and separate basis of denial, we decline as a matter of enforcement discretion to pursue supplies of drugs under state control that will be used for execution by lethal injection. So in Cheney, the FDA clearly was announcing a categorical policy that it wasn't going to regulate the state use of drugs in carrying out the death penalty, and it wasn't a criminal prosecution. So I think it's on all fours in favor of us. Here we have an exercise of enforcement discretion that is committed to the agency's unreviewable discretion under Cheney. It doesn't fall within any of the exceptions to Cheney where Congress either restricts the exercise of that discretion, because here we're talking about enforcement, not non-enforcement, and it doesn't fall under the complete abdication exception to Cheney because, again, we're talking about enforcement and not non-enforcement. Wouldn't what you just read also have made DACA itself unreviewable, to pick up on Justice Kagan's question from earlier? No, Your Honor, and again, because critically, it falls within... What's the distinction between DACA and the FDA policy? Oh, the DACA and the FDA policy. Well, because in the FDA policy, nobody was claiming that somehow a statute restricted the FDA's ability to not enforce the law. Nobody made that argument. In the DAPA litigation, I think is maybe what you're referencing, Texas specifically argued that the INA did, in fact, restrict the agency's authority to exercise its enforcement discretion to not enforce the law. And again... One of the things that Texas argued in the DAPA case was that the agency action in question there conferred certain benefits on the individuals who were affected. And if you look at the case, if that was sufficient to make that reviewable, does the wind down of DACA remove certain benefits that individuals would have? And if it does, would that make this reviewable? I think the answer is no and no. And the reason why is, first of all, the rescission of DACA doesn't rescind any benefits. Those benefits are allowed to expire on their own terms. But even putting that aside, the work authorization and the other benefits are simply a collateral consequence of the exercise of prosecutorial discretion itself. So they don't make the prosecutorial discretion itself reviewable. Otherwise, every grant or denial of deferred action would be subject to APA review because every grant and denial of deferred action has collateral consequences that impact work authorization. If I could give you a hypothetical that I think makes it more concrete. Suppose a prosecutor has a drug diversion program and he says that I'm not going to prosecute this particular category of drug offenses if the individuals agree to enter into drug treatment. The drug treatment is a collateral consequence of and a benefit that flows from the prosecutorial decision, but it doesn't render the prosecutorial decision itself subject to review. And likewise, if a new prosecutor comes in and says I don't like drug diversion programs, I want to have a zero tolerance policy for drug offenses, that isn't reviewable either. But I do think that the challenge to DAPA in the prior litigation was reviewable, to be clear. It was reviewable because it fell within the Cheney exception. Texas argued, the Fifth Circuit agreed, that the INA in fact restricted the Department of Homeland Security's ability to not enforce the law, and frankly, we agree with that. But the problem here is that there's no argument by anybody or any possible argument that could be made that somehow the INA restricts the Department of Homeland Security's authority to enforce the law. After all, Congress typically wants the executive branch to enforce the laws that it passed. Are you... Is this an appropriate moment to move to assuming reviewability, the merits? Anytime you want to move there, Your Honor, I'll move there. One argument that the other side makes along those lines is similar to this one we've just been considering, the reliance interests that have grown up around DACA. And what do you say to that and whether they've been adequately considered in this case? Two things, Your Honor. First, I would say that to the extent there are any reliance interests, they're extremely limited. DACA was always meant to be a temporary stopgap measure that could be rescinded at any time, which is why it was only granted in two-year increments. So I don't think anybody could have reasonably assumed that DACA was going to remain in effect in perpetuity. Even putting that to the side here, the agency considered the reliance interests. Secretary Nielsen did so quite clearly and explicitly. The agency mitigated the reliance interests through the orderly wind-down, and it simply concluded that beyond that, it didn't justify maintaining in perpetuity a program that actively facilitated violations of the law by hundreds of thousands of individuals. May I ask you? I'm sorry. I'm sorry. No, no, continue. Thank you. If I understand, though, your colleague's argument on the other side, it's not that Secretary Nielsen failed to consider reliance interests. There's that paragraph, I believe, in the Petition Appendix, around 125, somewhere in there. There's a paragraph. But that given the extent of the reliance interests and the size of the class, more needed to be said, more could be said, and it wouldn't be a huge burden to require the government on remand to say more. So as I understand that, that's the nature of the argument. Right. And I guess I'd have a couple of responses to that. The first is that I don't think it reflects an accurate understanding of APA review. As this Court has repeatedly made clear, really, the only thing that matters is whether the agency, and I think I'm quoting from the case law, completely failed to consider an important aspect of the question. And I don't think that you can even remotely argue here under State Farm that we completely failed to consider an important aspect of the question. Secondly, I think that Secretary Duke's memorandum under the proper standard clearly satisfies the APA standard for considering reliance interests. She does so explicitly in the portion of the memorandum that you referenced. And in addition, what I point out is that at the very beginning of her memorandum, page 2, she specifically says that one of the things that she considered were the judicial opinions reviewing the Duke memorandum, all of the district court decisions. And so then when she gets to the specific discussion of reliance interests, she says that she is keenly aware that people have ordered their lives in light of the DACA decision. So I think it's quite clear that she is fully taking into account the whole panoply of reliance interests that were discussed ad nauseum in the district court decisions and simply concluding that they didn't justify maintaining the policy. I'd like to continue the same question because, look, the best statement of the law, in my mind, this is a very old principle again, was Justice Scalia's writing for the court in Fox. He says, when an agency's, quote, prior policy has engendered serious reliance interests, it must be taken into account. All right? That's this case, I think. All right. And I think that's actually not just the people who came in. You know, the 700,000, they've never been anywhere else. They never have to. But there are all kinds of reliance interests. I counted briefs in this court, as I'm sure you have, which state different kinds of reliance interests. There are 66 health care organizations. There are three home builders, five states plus those involved, 108, I think, municipalities and cities, 129 religious organizations, and 145 businesses. And they all list reliance interests, or most of them list reliance interests applicable to them, which are not quite the same. They are not quite the same as those of the 700,000 who have never seen any other country. And so then I did read what you just read to me. Now, you want to say anything about the statement you just read to me being adequate to take into account that broad range of interest? Yes, Your Honor, I do. Because the first thing I want to say is that State Farm itself says, and here I've got the quote, you violate the APA only where you, quote, entirely fail to consider an important aspect of the problem. Here, Secretary Nielsen explicitly considered the reliance interests, including all of the things that you just listed that were set forth in excruciating detail in the numerous district court decisions that have ruled against us, which she says she specifically considered. But not in her memo. Well, Your Honor, I frankly think that she does. But the other thing that I would say is that under this conception of APA review, DACA and DAPA likewise would have failed arbitrary and capricious review because there is not a single word in the DACA memo itself or the DAPA memo itself explaining any of the potential costs or benefits or impacts on other people that the implementation of the DACA program would have had. I'll take either one, Your Honor. If I understand Secretary Nielsen's memo correctly, Secretary Nielsen said that she did have a conclusory statement about weighing the reliance interests, but she weighs them against what she calls, I think it's the questionable legality of the program. Now, that assumes one of the things that we're all here to discuss, which is that the program was of questionable legality. If the program turns out not to be of questionable legality, in other words, if some or many of us think that the original program was legal, how does her memo suffice to do that balancing? For a couple of reasons, Your Honor. First, because she sets forth separate and independent bases justifying the rescission. First, her belief that it's illegal. Second, her belief that there are serious doubts about its illegality. And third, her conclusion that as a matter of enforcement policy, the Department of Homeland Security is against these kinds of broad-based non-enforcement decisions. Any one of those that her memo explicitly says is a separate and independent base. But in her statement about reliance, she particularly says it outweighs this questionably legal program. I think what she is saying here is that given that there are extremely limited reliance interests in the first place, any limited reasons that she has articulated as separate and independent grounds for rescinding DACA, I think that's the only fair way that you can read that memorandum. I have always had some difficulty in understanding the illegality of DACA. In DAPA, I put aside because in DAPA, there was actually a process for attaining the DAPA. And I saw the argument that what DAPA did was directly contrary to that path. But I don't see anything in the INA that takes away the discretion of the agency in ordering its enforcement policies. We all know it has limited resources. It can't, even when it is limited, remove the vast majority of aliens we have here. And so I have always had some difficulty in understanding what is wrong with an agency saying we are going to prioritize our removals. And for those people, like the DACA people, who haven't committed crimes, who are lawfully employed, who are paying taxes, who pose no threat to our security, and there's a whole list of prerequisites, we're not going to exercise our limited resources to try to get rid of those people. I still have an impossible time. I know you're going to argue contrary to what was said. Sure. So I guess I have three responses here. But let me just finish my question, okay? So putting aside that, the Secretary in giving these extra reasons, because none of this was in the Duke memo, and I thought basic administrative law is you look at what's first given to you, not what you add later. But assuming you ignore that, and even look at the Nielsen memo, I think my colleagues have rightly pointed, there's a whole lot of reliance interests that weren't looked at, including the very President, current President, telling DACA eligible people that they were safe under him, and that he would find a way to keep them here. And so he hasn't. And instead he's done this, and that I think has something to be considered before you rescind the policy. Not just saying, I'll give you six months to do it, to destroy your lives. Putting all of that aside, I'm going to get to my question. And maybe we have an opportunity to hear the three answers. Don't forget the three, I know you won't. But really, where is all of this in the memo? Where is all of this really considered and weighed? And where is the political decision made clearly? That this is not about the law, this is about our choice to destroy lives. So Your Honor, four responses now. I think I've added one. The first one is that I think that the prior President didn't, couldn't, and hasn't made any kind of promise that DACA would remain in effect in perpetuity, because it would have been impossible to make that promise. In fact, every one of my friends on the other side, I think, has agreed that we could rescind DACA at any time if, at least in their view, we did provide a little bit more detail of an explanation. So I think that is four square against the notion that there's some significant reliance interest, because all that they seem to be saying is we have to write a few more works. Putting that entirely to the side and turning to the legality question, ultimately I don't think you, my first point is I don't think you have to decide ultimately whether DACA is legal or illegal, because I think the other reasons we've given are more than sufficient to justify the rescission, both our serious doubts about its legality, as well as our general opposition to broad-based non-enforcement policies. After all, the Department of Homeland Security is a law enforcement agency, and a law enforcement agency doesn't have to push its dubious power to not enforce the law to its logical extreme. But don't you have to, don't you have to set up some kind of category? I mean, everybody agrees, but is that how many, 11 million people? They don't have the resources. So you have to prioritize. Everybody agrees. Absolutely, Your Honor. How do you do it other than categorically? And that's my second point, Your Honor. My second point is that DACA goes far beyond simply diverting resources to higher priority targets, which you are absolutely right. Every law enforcement agency has to divert resources to higher priority targets. DACA goes materially further than that, because it actively facilitates violations of the law by providing advanced forbearance, coupling it with affirmative benefits like work authorization and Social Security benefits, doing it on a categorical basis, and significantly, and this was my third point, it has no limiting principle. So the forbearance would be okay if it weren't attendant benefits. We're not going to immediately deport the dreamers. I think that would be, if you provided just the advanced forbearance, I think that would be a lot closer of a question. But here, it's a lot easier because you're coupling that with work authorization. And my final and critical point is that there's no limiting principle. The theory on which DACA rests effectively allows the government to create a shadow INA for any category of aliens that it chooses to make low priority targets, a shadow second tier INA. And you very least need to locate something in the INA that confers that kind of broad and unfettered discretion, and there's simply nothing there. But again, I don't think you... The INA does give quite a lot of discretion to administrative officers, as you yourself admit and have argued on previous occasions, and indeed, in part here. So are you saying that DACA was violated, any particular provision of the INA? What are you saying that violated? Because there's a big delegation that says, you get to make national policy. So what did DACA violate? I'm saying two things, Your Honor. First, I'm saying you don't really have to address this issue because we think all of the other reasons are more than sufficient. But secondly, we're not saying that there's a specific provision that it conflicts with, but what we are saying is that when you adopt this kind of broad and historically unprecedented program, you need to at least locate the authority to do so somewhere in the INA. No, they located the authority in the INA's grant of broad discretion over national immigration enforcement policy. Your Honor, I think that the most that does is it gives you the authority to set policies and priorities. But there's a big leap between that and saying that you can affirmatively facilitate violations of the INA by hundreds of thousands of individuals to whom Congress has repeatedly declined a pathway to lawful status. Again, though, I don't think this is an issue you need to ultimately resolve because I think the other reasons we've given for rescinding DACA are more than sufficient to justify it, including our serious doubts about its legality alone. Simply as a matter of law enforcement policy, it is eminently reasonable for a law enforcement agency to say, I'm not going to go extreme when it does three things. It undermines confidence in the rule of law itself, it conflicts with the agency's law enforcement mission, and in a case like this, it creates the serious possibility of a court-ordered shutdown of the program rather than an orderly wind-down within the agency's control. If DACA was illegal, that means that when the government was giving out these benefits, it was acting illegally, right? Yes. Now, it's not always the case when the government acts illegally in a way that affects other people that we go back and untangle all of the consequences of that. Did Secretary Nielsen, when she was considering the reliance interest, was she looking simply to the question of a wind-down or was she looking more generally, for example, to the application of something like the de facto officer document, where officers acted illegally, but we don't go back and invalidate their prior actions? I think both, Your Honor, both. The orderly wind-down, to a certain extent, takes into account reliance interest. It doesn't fully account for everything, but the whole idea was that you're giving people an opportunity to order their lives in a time period to allow them to do that. But she also specifically states in the memorandum that, in addition, the notion of ad hoc deferred action will be able to take care of reliance interest in truly extraordinary circumstances the way that it has been used sporadically in the past to address those types of scenarios. Now, the basic Hornbook rule, we have three Hornbook rules in this case. As was mentioned, Chenery, it is a foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action, right? In which case, we look to Mr. Duke's memo, not to Ms. Nielsen's. Isn't that when it took the action? And if so, I want to hear you say, no, it isn't so, but if so, why don't we just affirm the district court, which sends it back? And if you have all these reasons and you really want to consider the reliance and all those things should be considered carefully, you can do it. So what's wrong? For two related reasons, Your Honor. First, sending it back would make no sense because the agency has already acted. Secretary Nielsen has already ratified Secretary Duke's decision for the reasons set forth in her memorandum. It's not a post hoc rationalization. It's the official position of the agency set forth by the agency itself. And secondly, there is no reason why Secretary Nielsen should have had to reinstate DACA and then rescind it again. Not reinstated. What you do is there are 50 cases on this. If it's important, what you do is you say, it is good reason for holding the status quo until we can go back. And courts have affirmed that. We hold the status quo and we go back now and we look at their reasons beyond the contemporaneous reason, which is the Duke memo. Well, that's precisely what Secretary Nielsen's memo did. It did two things. First, it explained the basis for Secretary Duke's decision. But secondly, it set forth her own independent judgment. And we have all these 150, 350 briefs with all these different reasons and she had that in front of her. Now, that may go to whether you think her memo is sufficient, but it doesn't go to whether you think her memo is an operative document in this litigation. I'd like to point you to two places in her memorandum. First, page 121A of the Regent's Petitioner's Appendix. This is the second page of her memorandum. The explanation reflects, the first thing, my understanding of the Duke memorandum and, second thing, why the decision to rescind the DACA policy was and remains sound. If you look at the end of her memorandum, she states in the very last sentence, for the reasons, for these reasons in setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decisions to rescind the DACA policy. Can I pick up on Justice Kagan's question earlier? Does the Nielsen memo ever say, even if DACA was lawful, I would still exercise my policy discretion to discontinue? Yes, Your Honor. So, if you look at the memo... What sentence are you looking at? I'm looking at two sentences. Page 123A. This is after she says it's illegal. Page 123A. Second, regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by the DHS because there are, at a minimum, serious doubts about its legality. May I make one more sentence? And then third, if you look further down the page, it says, regardless of whether these concerns about the DACA policy render it illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy.  Thank you, Mr. Chief Justice, and may it please the Court. The government's termination of DACA triggered abrupt, tangible, adverse consequences and substantial disruptions in the lives of 700,000 individuals, their families, employers, communities, and armed forces. That decision required the government to provide an accurate, reasoned, rational, and legally sound explanation. It utterly failed to do so, asserting only the Attorney General's unexplained assertion that he had no discretion because DACA was an unconstitutional exercise of authority by the Executive Branch. The decision overturned a five-year enforcement policy of deferred action that had enabled DACA recipients under other, unchallenged laws and regulations to apply for employment authorization, seek driver's licenses, and other benefits. Its abrupt reversal removed a conditioned precedent to these rights and exposed DACA recipients and their employers to immediate, potential, coercive government measures. It was impermissible to do so based on an unexplained, unsupported, and erroneous legal conclusion that the policy that two administrations had enforced and implemented, had supported and implemented for five years, was unlawful and unconstitutional. The decision to rescind DACA was reviewable. This Court has said several times just in the past few years that we start with a strong presumption of reviewability of agency decisions. This is the strong presumption that the Court described in the Weyerhaeuser case just one year ago. Unless agency discretion is limited by law, and there is no citation to any limitation in the law, limitations on reviewability by the courts are quite narrowly construed, and there are rare circumstances. These are the Mock Mining case and the Judelang case. These Weyerhaeuser, Mock Mining, and Judelang cases are three cases within the past eight years where this Court has talked about the presumption of reviewability as a strong presumption, exceptions narrowly construed, and all three of those decisions were unanimous decisions by this Court. Would you say that whenever a law enforcement agency has guidelines for the exercise of prosecutorial discretion, and it then tightens those guidelines so that cases that previously would not have been prosecuted may now be prosecuted, that is agency action that is subject to review under the APA? I would not say that, Justice Alito, but this is a very, very different circumstance. This is an agency decision initially, and the Attorney General refers to it as an illegal decision, but it's an initial decision that is responsive to explicit congressional direction to DHS to establish enforcement priorities. That's what DACA was all about. It said it did not establish any status. It did not provide any benefits. It articulated an enforcement priority which Congress not only directed DHS to make, but in fact required it to make, because only 400,000 people out of the legislature I'm not sure that really responds to my question, so I'll give you an example. Let's say that there is a policy that a certain category of drug cases will not be prosecuted in federal court. Let's say they are cases involving less than 5 kilos of cocaine. So cocaine cases with lesser amounts of drugs will not be prosecuted in federal court as a matter of enforcement priority, and then that is changed. So the 5 kilos is reduced to 3. Would that be reviewable? No, I don't think it would. Well, what's the difference? Well, I think that the Justice Department through the Attorney General, every new Attorney General establishes new enforcement priorities with respect to pornography or drug cases or things like that. That's completely different than this, which singled out a category of persons pursuant to congressional authorization, invited them into the program, provided other people associated with that decision, and the individuals relied upon that for 5 years. The administration, when it does that kind of a decision with respect to the lives of hundreds of thousands of people, which is engendered reliance, which reverses not only a position of two administrations, but the Office of Legal Counsel changes policy, then all we're saying is that there's a presumption of reviewability of that decision. But you're saying it's reviewable because DACA conferred certain benefits beyond deferred prosecution. Is that what you just said? No, I said the benefits were triggered by the decision of enforcement policy in DACA, but those benefits are triggered by other statutes enacted by Congress, funded by Congress throughout all this entire period of time, and the government hasn't challenged those. So those benefits, the driver's license business and the work authorization, if you apply for it, if you come forward, identify yourself, put yourself into the program, take risks. Mr. Olson, the whole thing was about the work authorization and these other benefits. Both administrations have said they're not going to deport the people. So the deferred prosecution or deferred deportation, that's not what the focus of the policy was. Yes, the other statutes provided that, but it was triggered by the memo. So I don't understand sort of putting what the policy really was about, which is the work authorization and the other things off to one side. It's very helpful. Well, I think that one has to focus on the fact that this was Congress authorized the Department of Homeland Security to identify enforcement priorities. Once it did, because it was required to do so and it had no choice because of the funding, once it did so and it identified the persons, and this is helpful to the agents in the field to identify which individuals are going to be subject to enforcement and which individuals are not, other statutes provided that benefit. You're correct that it triggers that, but it's triggered by other benefits and so forth. If the government is opposed to those benefits given to individuals who are not in an enforcement priority category to support themselves, to go to work rather than put themselves in the hands of the government to support them, to become a part since they're not going to be deported, at least for the short period of time, those are the things that if the government wanted to get rid of, the government should be challenging those. It should not be challenging a decision that's essentially required by Congress. And let there be no mistake about why this decision was made. The Attorney General specifically said that DACA was illegal and unconstitutional. I don't know where the unconstitutional came from because it didn't come from the Fifth Circuit. But let's say it was an illegal enforcement priority. And there's no doubt about why this happened. In the cert petition or in the government's brief that refers to the questions presented, it specifically says the original DACA policy was unlawful and then goes on to say thus it had to be terminated. There's no question about that. So the Duke Memorandum, which was the Attorney General's decision and opinion, under statute is enforceable and binding on the government agencies. There's a statute that specifically says that. So the Duke Memorandum had no discretion, no choice. The Attorney General of the United States... Mr. Goldsmith, I think you've moved on to the merits. And I guess I'm still struggling with Justice Alito's question on reviewability. Can you help me understand what is the limiting principle? I hear a lot of facts, sympathetic facts you put out there, and they speak to reviewability here for an enforcement, a classic kind of prosecutorial discretion that one might have thought would have fallen under Heckler v. Cheney and the example Justice Alito gave or Heckler v. Cheney itself. What's the limiting legal principle? Well, in this case, it's a composite of principles, a categorical determination involving a substantial number of people to make decisions based upon that. Let me just stop you there, though, because if it's categorical and a large number of people, I can think of a lot of prosecutorial decisions involving drug cases, the treatment of marijuana in our society today under federal law. Perhaps it would be cocaine, five kilograms. Whatever's in the Attorney General memo affects lots of people on a categorical basis every day, and you, I think, would not have us review those decisions. No, but may I refer to... So if it's not categorical and it's not a large number of people, what's the limiting principle? As I said, it's a combination of factors, which include the government inviting people to rely upon and make decisions based upon that policy, the provision of benefits connected with it, individuals making choices, and then the Hackler case... Don't other people rely on the Attorney General's guidance memos and documents? There's an entire industry in a lot of states involving marijuana that would argue they're relying on memos issued by the Attorney General that we will not enforce marijuana laws, for example. Do they now have a right to... No, I think it's completely different. They are not invited to participate in a program to reveal the business that they're in, to come forward, to take advantage... They have a lot of economic interest at stake that I think under Fox and what we heard about earlier from Justice Breyer, they would say our economic interests are very real. Billions of dollars are at stake. We've relied on the Attorney General's guidance memos. I just would like to quote this one sentence from the Hackler v. Cheney decision itself. When an agency does act to enforce, that action itself provides a focus for judicial review because it imposes the coercive power of the government with respect to individual liberty and property, and that is the kind of decision that judicial review is intended to... Doesn't every prosecutorial decision affect individual liberty or property? Prosecutorial decisions, yes, of course. This is an announcement of a policy, this is a reversal of a policy that the government created that triggered, to use the words of this court, engendered reliance interests, and all we're saying is that it should be subject to review in the context of this big picture. It doesn't say that every decision by a prosecutor that I'm going to now enforce murder cases or kidnapping cases or child-born cases or serious drug cases, it doesn't cause individuals to come forward to participate in a program, to make decisions. Businesses, health, educational institutions, the armed forces, all are making decisions based upon this. No one was saying that the policy can't be changed, but when the policy does, the government wishes to change a broad policy like this which affects so many people in so many serious ways. Well, if I might ask a question about that, if we're talking about the merits of that, and then I'll pass off the baton, the reliance interests that we've talked about earlier. I think your friend on the other side would say, we did address reliance interests in a paragraph, and we could do it in 15 pages, but we'd say pretty much the same thing at the end of the day, and it'd take another six years, and it would leave this class of persons under a continuing cloud of uncertainty and a continued stasis in the political branches because they would not have a baseline rule of decision from this court still on this issue. It's what this court has said. What do you say to that? And that's the line of argument, as I understand it, from the government. Yes, I know it is. And the government's saying, all we needed was a few more words. That is not what this court has said with respect to administrative review of judicial review of administrative decisions. You must have a rational explanation. It must make sense. It must be contemporaneous. I would get to the Nielsen memorandum, which was not contemporaneous. It was not a new decision. I understand that. If you could just address it, though, on the merits. Why was that insufficient, I think is one of the questions, and the other is, what good would another five years of the adequacy of that explanation serve? We don't know what the administration would do. The administration did not want to own this decision. When the attorney general decided that this, I'm making this decision because the doctor... I guess I'm asking about the reliance interests. I'm trying to get to that. I wish you would. The reliance interests were triggered, to use the words of this court, in the Fox case, the LTV case, and various other cases. Those reliance interests were engendered by the decision, by the government, that caused people to come forward. I understand that. The question is, what more would you have the government say about those reliance interests? If it's a failure of adequacy of explaining, what more is left to be said? What they could have said is that we understand all of these people working for all these people. We understand what people are going through. Provide a reason, rational explanation, to use the words of this court, just a few months ago, in the census case, to explain those things, to explain why a policy is being changed, and make a contemporaneous decision. The Nielsen Memorandum came along nine months later. It was based upon a different individual. It didn't have an administrative record. Assuming... Well, go ahead and finish. Well, I could take another sentence or two, but there are a lot of things wrong. The Nielsen Memorandum was not an independent decision. She was bound, just as the earlier administrator, acting administrator, was, because the Attorney General said this is illegal. But the Nielsen Memo then goes on to say, as you heard Mr. Francisco say to my question, that regardless of whether these concerns about the DACA policy rendered illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy, and then goes on to explain the policy rationales to rescind it. So what is your response, Mr. Francisco? Well, in the first place, they were not independent. They were not contemporaneous. They were not accompanied by an administrative record. She says they're independent in that sense. She said they're independent. At least that's what Mr. Francisco says to you. Mr. Francisco said that, and she said that, but they weren't independent, because she was bound by the Attorney General's decision. And the government itself, in its brief, that DACA was unlawful, thus we had to terminate it. Now, and it's not contemporaneous, and then, basically, the policy decisions are saying, we understand people may have relied on this, but that's just too bad. That's basically all it was. And then the litigation risk issue is like a rubber stamp that the agencies can put on anything, every decision an agency makes. Do you agree that the executive has the legal authority to rescind DACA? Yes. Okay. So the question, then, comes down to the explanation, and if it's the Nielsen memo paragraph on reliance that it comes down to, so which is the last... Well, it wasn't... First of all, it was not explained... Can I just ask the question in this way, which is, assume the Nielsen memo comes in, and assume it comes down to whether the Nielsen memo adequately explained the reliance interest. What was the shortfall in the Nielsen memo in addressing reliance interest? Because she does acknowledge that a lot of people have relied. She does it briefly. Yeah, she says it's just too bad. People relied, so too bad. Too bad about that. Kemp v. Pitts specifically says, when an explanation for an agency decision is given, however curt, they must stand or fall on that explanation. Do you think you could explain the justifications for the policy in a way that would overcome the reliance interest? They would, yes. I believe that that's possible. They could have... An analysis of costs and benefits explaining why an OLC decision is being thrown out the window, why a policy is being changed that the administration is being... That's exactly what you have said. Mr. Olson, can I go back to something Justice Gore suggests, which is, what's the benefit of delaying this further? It has been, at least looking at the deferred action decisions, the dozens that have gone on through the decades, Congress has responded, sometimes changing the policy, sometimes limiting it, sometimes expanding it. It has responded. But the dynamic is very different, isn't it? When an executive says, I don't have the power, and when it says, even if I had the power, I choose not to do this. Aren't the dynamics of what happens between Congress and the president dramatically different in those circumstances? Exactly. This is what is called virtual reality, when it says, I don't have the power to do it, but if I did, in the sky, I might have done it for this reason. The short answer to your question, Justice Sotomayor, is a very good one. Someone say, I might have done it if I'd had the power to do it, but I have no discretion, I have no power to do it. We don't know what the administration would do if it had to make this decision and take ownership and accountability of this decision. That's your point about, given the Attorney General's decision and the law that says they have to change it. That's a very different circumstance than saying, even if I don't have to, I won't. That's exactly right. The administration would then have to explain, we want to take responsibility for throwing these people out of work, removing people that came here when they were maybe two years old, who have not committed a crime, and who have volunteered for this program, have conducted themselves properly, and so forth. Mr. Alsop, I understand that litany, but do you seriously want to argue that if this case were to go back, and the agency were to say, again, exactly what General Francisco interprets the Nielsen Memo as saying, giving all of these reasons and saying that each one is an alternatively, is an independently sufficient basis for the action, would that be unlawful? Let's say they go into great length in explaining every factor, every basis. If they explained and provided a rational explanation, instead of just pushing a button or putting a rubber stamp on it, that's what judicial review is all about. That means the agency would have taken responsibility for making the consequences of those decisions, explaining why it thought about it and why it decided what to do. That's what your decisions require by judicial review. Thank you. Thank you, counsel. Mr. Mondin. Mr. Chief Justice, and may it please the Court. It was up to petitioners to decide how to frame their decision to terminate DACA. It could have taken responsibility for a discretionary decision, rescinding a policy that affects hundreds of thousands of lives. Instead, they chose to end the policy based on the ground that DACA was unlawful. They told the public that the law deprived them of any discretion to continue it. And when Judge Bates invited them to make a new decision, they stood by the old one. That's their prerogative, but it has the consequence that they have to defend that decision based on the legal rationale they originally offered, and the decision is reviewable and cannot be sustained on that basis. Now, the problem with the rationale is, yes, they don't take serious account of the dramatic costs to DACA recipients and the economy and their employers and families of terminating this policy, and also that it is founded on the incorrect legal premise that DACA is unlawful. This Court can review the lack of, can affirm based on the lack of an adequate explanation for that ground or the fact that it is an incorrect conclusion and it is legal error. Now, if I can turn to the question of reviewability, the APA says that it commits agency actions that are unreviewable. And the central point here is that when an agency founds a decision on a public announcement that it lacks any discretion to continue a policy, that can't fairly be described as committed to agency discretion in any meaningful sense. This is the concept that the Court reserved in footnote 4 of Cheney, because that is not a discretionary choice that the law has committed to agency discretion. I think that it is critical for us to consider on the merits what my friend's position is with respect to DACA and deferred action. My friend appears to agree that they can grant deferred action to compelling individuals, that they can grant work authorization to deferred action recipients, and they seem to agree that this is a very worthy class of individuals. So their position boils down to the assertion that the INA prohibits them from adopting a transparent framework that guides the exercise of individualized discretion with respect to this very compelling population of individuals. And that's not consistent with the broad authority that Congress has granted the Secretary under the INA and under 6 U.S.C. 202, and it's not consistent with historical practice, where the agency over the decades has frequently adopted class-based discretionary relief policies that allow it to channel the exercise of recognized forms of discretion with respect to particular individuals in a defined class. Well, that history is not close to the number of people covered by DACA. Your Honor, there is a history of class-based deferred action policies, and they are narrower, to be sure. But there are other class-based policies that have applied to hundreds of thousands of individuals. The Family Fairness Policy, when announced, would have applied to up to 40 percent of the 50,000 people, right? That's the number that were availed themselves of that policy? That's right, because it was short-lived. But at the time it was announced, it was not clear that Congress was going to act, and the Executive told Congress that this would apply to up to 40 percent of the undocumented population at the time. When Congress did act in that statute, they signaled their approval of the Executive policy. The statute didn't have an effective date for another year, and Congress said that this is not intended to express disapproval of the existing Executive policy. And that's one example, but there are more examples of... ...that percentage was 1.5 million people, very comparable to this decision. Yes, and at a time when the total undocumented population was much smaller than it is today. Now, it is critical for the Executive in an area where it has broad discretionary authority to be able to set policies that channel the exercise of that authority. And this is a benefit of allowing for some measure of consistency and an even-handed approach in the exercise of deferred action. General, suppose that this administration had not relied on legal grounds to rescind the policy. It's very different from what they did, but let's just suppose otherwise that they had immediately and only relied on policy considerations. Are you saying even then the rescission would be reviewable, and why would that be? So if it were a pure policy rationale, it would fall outside of Cheney. It would be presumptively reviewable, as most agency actions are. I think it would be challenged, and the challengers would likely argue that there's sufficient general standards in this area to allow for a minimal level of rationality. Why would it fall outside of Cheney, do you think? I think that Cheney was very specific about the type of agency action that it addressed. It was a concrete decision by the agency not to enforce a statute with respect to particular actors. Now, that is different from a broad policy that guides the exercise of deferred action decisions prospectively. And Cheney was founded on a recognized tradition of non-review. It pointed to cases going back to the 19th century. When you say particular actors, did it not apply to anybody who was facing execution by lethal injection? As General Francisco has noted, there were broad policy considerations underlying the decision, but as it was described by the court, it was a decision not to enforce with respect to particular prison administrators and drug companies. And I think a different point here is that... Well, hasn't that been FDA policy for all of the years since Cheney? Sure, Your Honor, but that's a... Well, that's a big class of people. But that's a flat determination not to enforce, as opposed to a policy guiding future decisions about whether to grant deferred action, which itself is not a flat or final non-enforcement decision. They have argued that deferred action is revocable at any time and it's not a defense to removal. So we're dealing with a different type of policy here than the one that the agency dealt with in Cheney. I mean, look, I've always thought, well, it means the individualized kind of decision. But quite rightly, the Solicitor General reads me language, which is programmatic. But the United States has hundreds, thousands of agencies, which do enforce all kinds of things, which make programmatic rules all the time. And so what can't mean that Heckler is interpreting this committed to agency discretion to make serious inroads in the principle of including me, what's the line? And what's the line generally? It can't be so broad of all programs. It can't be so narrow as an individualized decision. Just what is it? Well, I think we can look to the language of the Cheney decision. It describes a decision not to take enforcement action. So perhaps if there is a broad policy that is a flat categorical decision that we will not take enforcement action, that would be one thing. Imagine an SEC rule or imagine a HHS rule. And what it says is we are not going to take action to give a certain category of people their benefits. Not reviewable. I mean, nobody would think that. So we're struggling still. And I'm saying honestly, I am struggling to get the right rule. I understand that there may be ambiguities at the margins here, but I do want to focus it on this case, because here Acting Secretary Duke identified one ground for terminating this policy. She said that she pointed to the Attorney General's letter, which concluded that the policy was unconstitutional and beyond statutory authority. And whether or not this might conceivably fall under Cheney, if it does, it still is subject to review. Here we have one to enforce. And you're saying as well that the ground being purely legal, it is not a discretionary ground. He said it was illegal. And therefore, it is not within discretion. Okay? Have I got those two right? That's right, Your Honor. Anything else? I think those are what we have focused on in this case. Well, counsel, I'm sorry to interrupt there, but I actually had understood your answer on the second one to be different when you were posing that question by Justice Kagan. And I thought you had indicated that whether it was based on policy grounds or on a legal assessment wouldn't alter the reviewability analysis in your view. So I guess I'm just curious, which is it? So to be more precise, if we're operating in a world where we assume that Cheney applies, our point is, regardless, this is reviewable because this is within a subcategory where the agency has disclaimed any discretionary choice. It has said we have no authority over the matter. And that can yet — That wasn't my — I'm sorry. That wasn't my question. So if, assuming we're living in a world in which the agency had alternative grounds, and one of which was policy grounds, I had thought you told Justice Kagan that this would be reviewable. And now I thought I understood you to say something slightly different to Justice Breyer. And perhaps I'm missing something. Well, let me try and clarify. We believe that a broad policy is not the type of action that's referred to by Cheney, consistent with some of the D.C. Circuit authority that's been cited in the briefs. Well, I think Justice Breyer — that just takes us back to the beginning of the discussion with Justice Breyer, which is that can't be so necessarily, because every prosecutorial discretion affects a lot of people. You had that discussion with Justice Alito as well. So I guess I'll let you go. But I'm still struggling with this line that you're asking us to draw. Well, it may be a difficult line to draw in the general case. But in this case, with respect, it is an easy line to draw because we know that this decision was founded on a binding legal determination by the Attorney General that they could not continue this policy. What if it were less, as you view it in categorical terms? What if the Attorney General said, I've looked at this, it's a close case, but on balance, I don't think we have the authority? Or if he said, I'm pretty sure we don't have the authority, but a court might come out differently. Does your analysis change, or is it only when he says, as far as I'm concerned, this is definite, it's illegal? No, Your Honor. We would argue that it's a type of action that's presumptively reviewable. And if the agency decides to base a decision on some discretionary choice, but with an explanation or rationale that's founded on litigation risk or legal doubt, that that would be a rationale that courts would be able to review. Is it enough for him to say, look, I've got a decision from the Fifth Circuit that tells me this is illegal. It's been affirmed by the Supreme Court by an equally divided vote. That's enough for me to say we're not going to do it? It's not enough to sustain the decision, Your Honor. I think that under these circumstances, given the nature of this program and the interests at stake, we don't think that any genuine statement of legal doubt or litigation risk would be adequate. But that's not what we have here. But even if you went through a legitimate balancing exercise, in other words, you talked about the law and what you were worried about, and then you talked about the reliance interests, and then you said, here's what we're weighing, and here's our judgment, do you think that that would be sufficient? I think as a general matter, an agency could base a discretionary decision on a reasoned analysis like that. I suspect that if we saw that decision, we would challenge it under the particular circumstances here. But the court might agree that if there were some substantial and detailed consideration of the actual cost of this and the reasoned legal analysis, then maybe that would be in a court size sufficient. But that's absolutely not what we have. So if you prevail and the case goes back, is it enough to say, look, we've read the amicus briefs that Justice Breyer pointed out about the reliance interests? We've read the Fifth Circuit's opinion in the Texas litigation. Presumably they would cite that as well. Would that be enough? I think that it would have to begin with the deficiencies that Judge Bates identified, which is that the agency has not actually identified with any particularity the legal grounds that it's concerned with. It does cite the adopted case. Yeah. I mean, what, do you need more than that? You've got a court of appeals decision affirmed by an equally divided Supreme Court. Can't he just say that's the basis on which I'm making this decision? Your Honor, no. And I think Judge Bates is exactly right on this. The reasoned explanation requirement is meant to facilitate judicial review and inform the public. And, yes, they point to the DAPA case, but there's four or five theories of illegality floating around there, ranging from the notice and comment to the take-care clause claim. And we don't know which ground the agency based its decision on. So that is a lack of a reasoned explanation, in addition to the fact that Well, what would an adequate explanation look like? I mean, what do you think they would have to do to be in the clear on this? Well, I think that they would at least have to identify the particular grounds that they're relying on to facilitate further judicial review of their underlying legal conclusion and explain why they believe it applies to the DACA policy when they point it to a case about a different policy, and then have some serious, and more serious than what we see in the Nielsen memo, accounting of the very substantial I suppose they say, yeah, we'll do that. We'll do that. And now, the authorities are legion on that you, we should decide on the basis of that Duke memo, that was the decision. rested on that, and you've heard that. Okay. There's another case where Justice Fortas wrote, you shouldn't play ping pong with the agency. Okay, so they're saying that's what a lot of their argument was. What's the point? What's the point? I mean, you'll send it back and they'll say, okay, right, DAPA was different. In DAPA, the court said that here, the DAPA program makes 4.2 million people citizens with a runaround of the normal way to become citizens when you have a child who's a citizen. And here, that has nothing to do with this case. They're not, no runaround. Okay, you point that out. They point, we're going to come out the same way. It's close enough. So, should, what's the argument against playing, as there is a sentence for against you, playing ping pong with the agency? I think that there is a very substantial meaning to a remand in this case, Your Honor. We don't truly know what the agency would do if confronted with a discretionary choice. If they knew that DACA were lawful, there's a new secretary and the administration has expressed broad sympathy for this population, and they very well might continue the reasoned explanation. My friend has said... It was remanded by Judge Bates or given time, and Secretary Nielsen did what you just said and said, even if DACA was legal, you heard Mr. Francisco on that, I would exercise my discretion to rescind, and then explained her consideration of the reliance interest. So, why is, there's already been an effect, a remand. There is a boilerplate assertion in that memo of independence. I will grant you that. I think if we look at the circumstances... Well, can I just stop you on boilerplate? And this is a serious decision. We all agree with that. And it was for the secretary, presumably. And to say, in writing, even if it's lawful, I nonetheless am going to exercise my discretion. I assume that was a very considered decision. Now, we can agree with it or disagree with the merits of it, but it seems... Yes, and I think it's important to look to the penultimate paragraph in that memorandum, where she conducts her collective weighing, and she considers those policy rationales along with the legal rationales, and say that, together, they outweigh the purported cost of terminating DACA. I also think it's critical to understand the context of this... So your point, just so I understand, I think this is your point, is that the legal considerations, while she said that, end up being intertwined in the subsequent paragraphs with the policy considerations. That's absolutely right. And this was, after all, in the context of a memo that they submitted to the district court in ongoing litigation, intended to defend and explain the prior decision. And I do want to note here that, to the extent that my friend has suggested this is a new decision or a new action and has been presented as such, that's not consistent with what they told the district court. The district court said, quite plainly, please notify me if there's a new decision. They submitted this memo and said, this is a motion to revise your order with respect to the original Duke decision. We want you to sustain the Duke decision. And the district court took them at their word and treated it accordingly. So I don't think that they can come to this court and suggest that it is a fresh decision and every rationale is before the court under camp. In that penultimate paragraph, what is the shortfall in the discussion of reliance interests in your view? Well, I'm not sure that there are — there is much of a discussion. She expresses some sympathy and then ultimately says that it is up to Congress to consider and weigh the reliance interests and the cost. It's not a detailed discussion of the dramatic harm to hundreds of thousands of young people, to their families, to their employers, to the states, to the economy that would arise from this decision. But she does say that in a sentence. If we remanded and it were detailed more fully, would it still fall short? I think the great value of a remand is that, to date, they have not made a decision that actually takes ownership of a discretionary choice to end this policy. And if they had a remand, if that is their intent, they could issue a new decision that actually does that so the public could hold them accountable for the choice they've made. Thank you, counsel. Five minutes, Mr. — oh, I'm sorry, Mr. General Francisco. Thank you, Mr. Chief Justice. I think I want to focus on three basic points. First, Justice Kavanaugh, I want to make sure you have all of the relevant portions in the Nielsen Memorandum that I think make this all quite clear. Page 122A, and I'm at the Regent's Petitioner's Appendix. In considering how DHS's discretion to establish enforcement policies and priorities should be exercised, the DACA policy properly was and should be rescinded for several separate and independently sufficient reasons. She then gives the first reason, the legality question. Then if you go to page 123A, second, regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by DHS because there are, at a minimum, serious doubts about its legality. Further down the page, third, regardless of whether these concerns about the DACA policy can render it illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy. And then she sets out the enforcement policy. If you move to page 125A, where she's discussing reliance, quote, I do not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons for ending the policy discussed above. And finally, when you get to the conclusion on page 126A, for these reasons, in setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decisions to rescind the DACA policy. So frankly, I don't understand... We don't know, from all of that, don't know how she would respond if there were a clear recognition that there was nothing illegal about DACA. Our whole memo is infected by the idea that this is, one, illegal, at least substantial doubt about its illegality. If we take that out, then the independent ground that you're asserting, then she would be saying we stand up and say this is the policy of our administration. We don't like DACA, and we're taking responsibility for that, instead of trying to put the blame on the law. Respectfully, Honor, I very much disagree. She sets forth explicitly on page 121A several separate and independently sufficient reasons. We own this. We both own the policy rationale set forth in Secretary Nielsen's memorandum. Also, because we think this is not subject to judicial review at all, we own the legal judgment set forth in Secretary Nielsen's memorandum. So simply stated, the fact that we've got alternative and legal policy grounds for making this decision make two things clear. First, it is four square within Cheney under the revealability issue because Cheney likewise rested on alternative legal grounds. The FDA believed it lacked jurisdiction and policy grounds. And secondly, it shows how this was plainly and eminently reasonable rescission, even if you disagree with us on the legal issue, because we've set forth separate and independent policy issues for the decision. So that was basically my first point. But even what you just read, General, in that key paragraph where the Secretary weighs the reliance interests against the reasons in her memo, everything's wrapped up. And we really don't know how she would have conducted that balance, how she would have weighed those two, if the legal had been taken away from it. I simply disagree with that. When she specifically says that she's setting forth separate and independent grounds justifying the rescission, I don't think that there's any fair way to read that, but by saying that she would have rescinded it based on any of the independent grounds, which brings me to the independent grounds. Number one, number one, we should not adopt a policy of non-enforcement of those laws for broad classes and categories. Okay? In Congress, she thinks, agrees with us. Well, I don't know. Maybe they do. Maybe they don't. But aside from that, that's a conclusion. Look at the second one. We should do it on a truly individualized, case-by-case basis. That's a conclusion. That isn't a reason. And the third one is a reason. The third one is it's important to project a message that leaves no doubt regarding the clear, et cetera, enforcement of immigration against all thought. That's an independent reason.  May I finish? May I finish? I'm going to try to squeeze in two points in a single sentence. The first point is that I very much disagree. All of those articulate the basic same policy rationale, that this is a law enforcement agency. They are against general policies that actively facilitate violations of the law. And the last point I will make is, well, we don't think you need to address the legality question if you agree with us on any of our other arguments. If you disagree with us on any of our other arguments, you absolutely must address the ultimate legality question because we simply cannot be forced to maintain a policy that this court concludes that it's illegal. So if you decide to get there, then we do think that DACA is illegal and was justifiably rescinded on that basis as well. Thank you, Your Honor. Thank you, counsel. The case is submitted.